## JEREMIAH B. DURHAM v. THE CARBON COAL AND MINING COMPANY.

1. QUESTIONS OF FACT, *When Fully Examined in Supreme Court.* Where a case is tried wholly upon depositions or other written evidence, it comes before us for examination in about the same attitude as before the trial court, and questions of fact may be fully examined and determined.

2. ———— Where testimony is given by a party, no wrong will ordinarily be done such party if the testimony so given be accepted as true. His testimony, like his admission, is good against him.

3. AGENT OF CORPORATION; *Testimony of Such Agent.* And where a party like a corporation can act only through agents, the testimony of those agents while still in its employ as to acts done by them as agents, and especially when they are themselves largely interested as owners or stockholders, partakes of the nature of personal admission or testimony.

4. AGENCY; *Ratification; Contract for the Sale of Land, Construed.* P., a principal stockholder, and though not an officer assisting in managing the affairs of defendant — a corporation engaged in the business of mining and selling coal — after consultation with the president, entered into a written contract with plaintiff for the purchase of certain lands. The contract purported on its face to be between the plaintiff and the defendant; was signed by plaintiff; and on the part of the defendant, was signed "Carbon Coal and Mining Company, by D. F. Blandin, president. By T. J. Peter." The contract called for a cash payment of $500. This P. made by giving his individual check, the officers of the company being absent. Subsequently, by direction of the president, the treasurer reimbursed P. the $500, and in his settlement with the board of directors this amount was allowed. Both president and treasurer were directors, and the two constituted a majority of the resident directors. The defendant took possession of the lands by sending employés on to prospect for coal, and sinking several prospect wells thereon. Not finding the vein of coal as thick as expected, about a month after the execution of the contract P. sent to plaintiff an open letter by the hands of the president, in which, admitting the purchase, he stated that it was made on account of representations as to the coal, which had proved untrue, and urged an arrangement of the matter in a christian spirit. After this, the defendant continued for a short time to work on the land. No express disaffirmance of the contract was made by the board, but the defendant refused to pay the subsequent installments of the purchase-money. *Held,* In an action therefor, that whether P. had authority or not to bind the corporation by signing the contract, it had accepted such contract and was liable for the purchase-money.

*Error from Shawnee District Court.*

ACTION by *Durham* against the *Carbon Coal and Mining Co.*, to recover $2,000 claimed to be due on a written contract for the sale of land. The case was tried by the court without a jury, at the May Term thereof, 1877, on the evidence introduced by the plaintiff. The defendant offered no evidence on the trial. The court found for the defendant, and rendered judgment against the plaintiff for costs, to which finding and judgment the plaintiff duly excepted. Thereupon the plaintiff filed his motion for a new trial, for the following causes, to wit:

"1. That the decision of the court herein is not sustained by sufficient evidence.

"2. That the decision of the court herein is contrary to law.

"3. Error of law occurring at the trial and excepted to by the plaintiff."

This motion was overruled; the ruling of the court thereon was excepted to, and the cause is brought by *Durham* to this court for review.

*John W. Day*, and *A. L. Williams*, for plaintiff in error:

1. We claim that this contract was within the scope of the authority and power of the defendant corporation, that such authority and power were delegated by the corporation to its president, and that the facts and circumstances proved by the evidence to which the attention of the court has been directed, fully warrant us in asserting the said agreement to be the contract of the defendant. In Green's Brice's Ultra Vires, 463, will be found the following language:

"It must also be remembered that the tendency of modern judicial interpretation and legislation has been to waive needless formalities, and that consequently at the present many agreements are held binding on corporate bodies, even without notification, which a few years since would, from technical reasons, not have been so."

See, also, Field on Corporations, § 197, pp. 216, 217. Here we have a case which fully warrants the application of this

modern rule of judicial interpretation. Peter was virtually the corporation, except so far as it was necessary to comply with the forms of law that other persons should be associated with him. He was notoriously the spirit that gave vitality to the corporation which was managed and controlled under his direction. The officers of the company were, in fact, his subordinates, who held their positions to do his will — dependent on his votes for their offices and their salaries. There can be no doubt that it was the intention of the defendant, in its corporate capacity, to make such contract — to purchase said farm. Having done so, and taken possession thereof, and worked and mined it, if the defendant had found better coal, and more of it, than the plaintiff or defendant had before conceived was there, can it be reasonably supposed that the defendant would have allowed the plaintiff to rescind the contract because it was signed as the evidence shows it was? Certainly not. It can scarcely be doubted that in such case the defendant would have insisted that it was the contract of the corporation. And there are not a few adjudicated cases to sustain such claim: *Eastern Rld. Co. v. Benedict,* 5 Gray, 561; *Skinner v. Stocks,* 4 B. & Ald. 437; *Sims v. Bond,* 5 B. & Ad. 393; 2 Nev. & Man. 614; Paley on Agency (3d Am. ed.), 324; Angell & Ames on Corp., § 316; *Potter v. Yale College,* 8 Conn. 60; *Beckham v. Drake,* 9 M. & W. 79; *Commercial Bank v. French,* 21 Pick. 486, and authorities there cited; *Vermont Central Rld. v. Clayes,* 21 Vt. 30; *Rutland & Burlington Rld. Co. v. Cole,* 24 Vt. 33. In 1 Hilliard on Vendors, pp. 435, 436, subdivision 19, will be found the following :

"The objection of want of mutuality may be waived. Thus, a bill was filed by a railroad company, for specific performance of a contract for the purchase of land, entered into by its agent. The defendant objected, that it did not appear that the agent was authorized under the corporate seal, and therefore there was no mutuality. The objection was overruled, on the ground that the company had, before the bill was filed, acted on the contract, by entering into possession of the land and making a railroad over it." (*London, &c., Rld. Co. v. Winter,* 1 Cr. & Ph. 57.)

Now, if the defendant could maintain an action against the plaintiff on this written agreement for specific performance of the contract on his part, by what mode of reasoning, or upon what principle of right or justice, law or equity, can it be held that the defendant is not equally bound thereby? Specific performance will not be decreed unless the contract is mutual; or where one party only is bound by the agreement. (1 Hilliard on Vendors, 435.)

It would be dangerous to permit parties to lie by with a view to see whether the contract will prove a gaining or losing bargain, and according to the event either abandon it or claim a performance. (16 Me. 92, 99, 100; *Alley v. Deschamps,* 13 Ves. 228.)

In the case at bar the contract was made in the name of the defendant company, under the immediate direction of its president, who was also the superintendent, having authority to make such contracts; and the agent through whom he did a part of the business, and whose action by his own acts he approved, was the controlling stockholder in, and an active, directing and managing member of the company, with whom the officers consulted about the interests of the corporation. All that Blandin and Ewing and Peter did in connection with said business was done by them as managing officers and agents, for and in the name of the company, and not by them individually. Why then was not this the defendant's contract? *M. K. & T. Rly. Co. v. Brown,* 14 Kas. 557; *Atlantic & Pacific Rld. Co. v. Reisner,* 18 Kas. 458; *Pacific Rld. Co. v. Thomas,* 19 Kas. 256; *Central Branch Rld. Co. v. Ingram,* 20 Kas. 66; *The Northwestern Distilling Co. v. Brant,* 69 Ill. 658; *Wilks et al. v. Back,* 2 East, 142; *Mussey v. Scott,* 7 Cush. 215–217; Dunlap's Paley's Agency, 182; *Wilburn v. Larkin et al.,* 3 Blackf. (Ind.) 55; *Webb v. Burke,* 5 B. Mon. 54; *Hunter's Adm'rs v. Miller's Ex'rs,* 6 B. Mon. 612–626; *Cook & Co. v. Sanford,* 3 Dana, 237.

2. We also claim that the evidence in this case shows a ratification by the defendant of the contract made by its officers and agents with the plaintiff. It seems to us that all the

facts and circumstances thus proven, taken together with the other fact that the defendant never affirmatively repudiated the acts of its officers in making a contract within the scope of their authority, and by which they could bind the company without the approval of the board of directors, constitute a ratification of the contract made with the plaintiff. We think the defendant is therefore doubly bound to discharge the obligation to Durham created by said contract — first, because the contract itself was binding on the defendant; second, because the defendant ratified the contract. While a principal may only be held to ratify an unauthorized act of an agent when he does so expressly, an authorized act of the agent will be implied from subsequent acts of the principal. If the name of the principal and a relation of the agency be stated in the writing, and the agent really be authorized, the principal alone is bound, unless the language express a clear intention to bind the agent personally. (American Leading Cases, 628, 632; Story on Agency, § 160; *Gilling, Mott & Co. v. The Lake Bigler Road Co.*, 2 Nev. 220, 221.)

No express vote is necessary to constitute a ratification by a corporation of an agent's act. A ratification may be inferred from corporate acts involving or implying a confirmation. (*Howe v. Keeler*, 27 Conn. 538; *Ridgeway v. Farmer's Bank*, 19 Serg. & R. 256; Field on Corporations, § 207, p. 225.) A ratification of a part of an unauthorized transaction of an agent, or of one who assumes to act as such, is a confirmation of the whole. *Farmer's Loan and Trust Co. v. Walworth*, 1 N. Y. 433; *Fowler v. Tull*, 1 Hun, 409; 3 N. Y. S. C. (Thomp. & C.) 522; *Krider v. Western College*, 31 Iowa, 547. In the case at bar, Peter assumed to act, and was employed by Blandin, the president and superintendent, as the agent for the benefit of the defendant, paid out money for it, and it reimbursed him out of its treasury.

Ratification may be either express or implied. Ratification is, however, much oftener inferred from the proceedings and conduct of the parties, whether private individuals or corporations, than plainly or positively declared. It is not easy

—perhaps, correctly speaking, it is not possible—for a corporation, which is invisible and unable by itself to perform any act, to ratify immediately; it can do so only indirectly, by the acquiescence of either its members as a whole, or its agents to whom it has intrusted a general authority. That it can thus bind itself is now completely established, as is shown by the decision in *Phosphate of Lime Co. v. Green,* Green's Brice's Ultra Vires, 463, 464, (L. R. 7 C. P. 43); *Athenæum Life Assurance Society v. Pooley,* 3 DeG. & J. 294; 23 L. J. Ch. 119.

The law is well settled, that a principal who neglects promptly to disown an act of his agent, by which the latter has transcended his authority, makes the act his own; and the maxim which makes ratification equivalent to a precedent authority, is as much predicable of ratification by a corporation as it is of ratification by any other principal, and it is equally to be presumed from the absence of dissent. (*Kelsey v. National Bank,* 62 Pa. St. 426, citing *Breden v. Dubarry,* 14 S. R. 30; *Gordon v. Preston,* 1 Watts, 387; *Bank of Pa. v. Reed,* 1 W. & S. 101; Green's Brice's Ultra Vires, 567 note *a.*) In the case at bar, there is a total want of testimony to show that the defendant disowned the acts of its officers and agents in making the contract in question with the plaintiff, or that it notified him that such acts were unauthorized. It is true that some effort was made by Blandin and Peter to "give up" the contract; but it is in evidence that after that they continued in possession of the premises, and dealt in the coal which was mined thereon—"bought it" from the miners (?). This pretext of buying the coal from the miners is thinner than the stratum of coal found on the farm in question.

In most cases of this character, the ratification becomes a matter of inference or implication from the acts and conduct of the principal: *Terrell v. Flower,* 6 Mart. 584; *Lorain v. Cartwright,* 3 Wash. (C. C.) 151; Story on Agency, § 253. And slight circumstances will sometimes be sufficient to warrant the conclusion of a ratification by the principal: Paley

on Agency, by Lloyd, 171; *Conn v. Penn*, 1 Peters (C. C.),
496; *Richmond Man. Co. v. Starks*, 4 Mason, 296; *Bank of
Columbia v. Patterson*, 7 Cranch, 299; *Rodgers v. Kneeland*,
13 Wend. 114; *Johnson v. Jones*, 4 Barb. 369. See also, Field
on Corporations, §§ 207, 208, 209, pp. 225, 228, and authori-
ties there cited. The attention of the court is also specially
directed to the case of the *Royal British Bank v. Tarquand*,
reported in 6 El. & B. 327; 21 How. 539.

*John Martin*, and *C. M. Foster*, for defendant in error:

1. The claim of the defendant in error is exactly the re-
verse of that of the plaintiff. We claim that the defendant
never executed nor authorized the execution of the contract
sued on, and that it never ratified any such unauthorized con-
tract. It is well-settled law, that the officers of a corporation
are the special and not the general agents of the corporation,
and no officer, by virtue of his position merely, can exercise
the powers of the corporation. By the General Statutes
(p. 195, § 23), the general management of the affairs of a
corporation is placed in the hands of a board of directors.
The president of a private corporation has no authority, by
virtue merely of his official position, to make contracts bind-
ing on the corporation, except in relation to matters arising
in the ordinary course of the business of the corporation.
(*Blen v. The Bear River & Auburn Water & Mining Co.*, 20
Cal. 602; *Walworth County Bank v. Farmers' Loan & Trust
Co.*, 14 Wis. 325; *Stow v. Wise*, 7 Conn. 219; *Fulton Bank v.
Canal Co.*, 4 Paige, 134; *Hoyt v. Thompson*, 5 N. Y. 320;
*Leggett, et al., v. N. J. Manufacturing & Banking Co.*, Saxton,
541; *Camp v. U. S. Mining Co.*, 7 Gratt. 352.)

The only duty which seems to be imposed on the president
of a corporation in the management of its business, by virtue
of his office merely, is to take charge of its litigation. (Morse
on Banks and Banking, 129.)

The purchase of real estate is not the ordinary business of
a mining corporation. If the president had the power to
purchase real estate for the purpose of enlarging its business,

then he would have the sole and exclusive control of the whole business of the company. He could sell the land where mining was going on, and transfer the business to any part of the country. If the president of a mining company has this power, then the president of every other corporation has the same power. The president of a railroad company could buy, lease or construct new railroads. The president of a banking company could purchase any land he thought necessary for the location of the bank. But no one claims that the presidents of such companies have any such authority. On this point, the case in 20 Cal., above cited, is applicable. The language of the syllabus of the case is as follows: "When a corporation is engaged in the business of conveying water through ditches, for sale to miners, a purchase of additional ditch property, with a view of extending the operations of the company, is not a matter within the ordinary business of such corporation, and its president, as such, has no authority to bind the corporation for such purchase." "The property purchased was not for the use of the corporation, but the object was to extend its operations, and the purchase was of no utility for any other purpose." The president of a corporation has no authority to sell and dispose of its securities. (*Titus & Scudder v. Cairo & Fulton R. R. Co.*, 37 N. J. Law, 98.) The board of directors had no authority to delegate this power to purchase real estate to one of its officers.

In case of *Gillis v. Bailey*, 21 N. H. 149, the by-laws of the company gave to the directors the same power as is conferred on the board by the laws of this state, and the court held that the power could not be delegated. But the contract sued on is not even signed by the president. The signature of an officer must be made by himself, or by some one in his presence, and by his direction. (*Kidder v. Prescott*, 24 N. H. 519.) If Blandin had the power as president to enter into a contract for the purchase of real estate, that power could not be delegated. It was one of trust and responsibility, and required discretion and judgment in its exercise. Such a power cannot be delegated. (Story on Agency, 14; *The Yellow*

*Jacket Silver Mining Co. v. Stevenson,* 5 Nev. 224; *Gillis v. Bailey,* 21 N. H. 149.) It is true that there are cases when an agent can delegate his power, but these cases are only where it must have been contemplated by the principal that the agent must employ another to act in his stead, either from the circumstances or from the nature of the employment. But this is not one of those cases.

It is urged by the plaintiff that as Peter was a large stockholder, that for this reason he had authority to bind the corporation. But it can make no difference who owns the stock of a corporation. The stockholder who owns the whole stock, if not an officer, cannot control the action of the company, except as he has power to fill its offices. It would be intolerable for the minority of the stockholders of a corporation, if the majority could, of their own will and outside of the corporate organization, manage its affairs. A corporation, however formed, must act as a corporation, according to the law of corporations. The property of a corporation cannot be conveyed by the stockholders, although every one joins in the conveyance. (*Wheelock v. Moulton,* 13 Vt. 519.)

It is further claimed that although the contract sued on was void, still the defendant is liable on it, for the reason that it has been ratified. It is conceded that an unauthorized act may be afterward ratified, and when ratified it has the effect of prior authority. It is also conceded to be law, that such ratification may be proved by direct evidence, or inferred from the conduct of the party. It is also well-settled law, that no party can ratify an unauthorized act who had not the power to authorize or perform the act in the first instance. If Blandin had no authority to make the contract, then he could not ratify it. If he had authority to make the contract himself, but no authority to delegate it, then he could not ratify the act of Peter. In this case, there is no evidence that the company ever in direct terms ratified this contract.

As this case now stands, the question before the court is, not what evidence is admissible to prove ratification, but

whether the evidence shows as a matter of law that the defendant ratified this contract. A case may be imagined where the acts of the defendant are such that this court would decide that the court or jury must find that a contract had been ratified, even where there was no direct vote of the directors. If the directors used and appropriated the proceeds of an unauthorized act knowingly, then it must be found that they had ratified the act. But in this case there is no such evidence. There is no evidence that the defendant's board of directors ever approved the act of Peter or Blandin, or that through their act the company ever received any benefit from it.

There are a few circumstances that counsel for plaintiff seize upon as a legal ratification of the contract. One of these is the allowance of the five hundred dollars to Peter which he had paid to Durham. This may be evidence (although slight) of a ratification of the contract, but it is subject to explanation. It certainly did the plaintiff no harm. The board of directors did not, when they allowed this amount, intend to ratify the contract. They had a right, as between themselves and Blandin, either to charge him with the amount, or to allow it to him in settlement. Of this Durham cannot complain. But the court below, in its general finding for the defendant, must have found that the board of directors by this act did not ratify, and did not intend to ratify, the unauthorized act of their president. This finding the district court was fully authorized to make, and it cannot be reviewed in this court.

There is a class of cases, few in number as yet, where it has been held, that when by its charter powers are conferred on a corporation in obscure and ambiguous language, and it becomes a question of legitimate construction as to what powers the corporation possesses, that in such a case, where the corporation deliberately decides that it has such a power, and acts upon it, and has incurred liabilities under such a construction, it will be held to that construction by the courts. But this is not that kind of a case.

16—22 KAS.

The opinion of the court was delivered by

BREWER, J.: This was an action to recover money claimed to be due on a contract for the sale of land. That a contract was entered into, is undisputed; but the defendant denies that it was its contract — that it ever authorized such a contract in the first instance, or ratified it after it was made. The contract, which was in writing, purported to sell a certain quarter-section of land to defendant for $7,500, to be paid as follows: $500 cash, $500 in sixty days, $1,500 in six months, $2,500 in eighteen, and $2,500 in thirty months from date. By the terms of the contract, the possession of said premises was given to the defendant; but, in consideration that the defendant should not be required to pay interest on the deferred payments, defendant agreed that one LeRoy D. Stone, the tenant (and son-in-law) of the plaintiff, should continue to occupy, for farming purposes only, so much of said premises as he then cultivated, until March 1, 1877, the defendant "reserving to itself at all times the right to enter said land for the purpose of mining the same." The parties to said contract were named therein as Jeremiah B. Durham on the one part, and the Carbon Coal and Mining Company on the other part, and the contract closed and was signed in the following form, to wit:

"In witness whereof, the said parties to these presents have hereunto set their hands and seals. . Dated the day and year first above written.

J. B. DURHAM. [Seal.]
CARBON COAL AND MINING COMPANY,
*By D. F. Blandin, President.*
*By T. J. Peter.*"

This contract was acknowledged before H. C. Williams, a notary public of Shawnee county.

The contention of the defendant is, that the president could not bind the company by a contract of purchase; that if he could, he could not delegate the power to a third party; and that the company never ratified this unauthorized contract.

The case was tried by the court without a jury. No find-

ings of fact or conclusions of law were asked for or made. There was a general finding and judgment in favor of the defendant. The whole evidence is preserved, and the question is, whether upon such evidence the plaintiff was entitled to a judgment. We need only advert to the oft-repeated ruling of this court, that all presumptions are in favor of the judgment, and that all doubtful questions of fact are solved by the decision of the trial court. So that the question is not whether upon the testimony a jury might be warranted in a verdict for the plaintiff, but whether such testimony compels a decision in his favor. In this case the defendant offered no testimony. It rested its case upon the evidence offered by the plaintiff. A part of this evidence was in deposition or other writing, and a part was the oral testimony of defendant's officers. If a case rested wholly in written evidence, whether document or deposition, it would come

1. Questions of fact; when fully examined in supreme court.

before us for examination in about the same attitude as before the trial court, and questions of fact might be fully and correctly examined and determined by this court. And where testimony is drawn from the lips of a party or his agents, no wrong will ordinarily be done such party if the testimony so given be accepted as true. A party's admissions are good against

2. Testimony of party, like his admission, is good against him.

him; so is his testimony. And where a party, like the defendant here, acts only through agents, the testimony of those agents while still in its employ as to acts done by them as agents, especially when they are largely interested as owners or stockholders, partakes

3. Agent of corporation; testimony of such agent.

something of the nature of personal admission or testimony. And further, when upon the record there appears no conflicting testimony, and it is apparent that it was accepted as true by the trial court, this court may properly act upon the same understanding, and inquire whether the law was by the judgment correctly applied to the facts. (*Rumsey v. Schmitz*, 14 Kas. 547.) In this case there is very little conflicting testimony. Much of it is in deposition or other writing, and most of it comes from the

lips of defendant's agents and employés.  Evidently, about the facts there was little doubt or dispute, and the real question was and is, whether upon those facts the plaintiff was entitled to recover.

Conceding that the mere execution of this instrument did not make a binding contract through want of authority in Peter to bind the defendant, still we think upon all the facts the court should have found that the defendant was liable. The agreement was one which the defendant could unquestionably have enforced against the plaintiff.  Even though made on the part of the defendant by an entire stranger, the defendant could at once have accepted the benefit of the contract, and the plaintiff could not then have pleaded the original want of authority in the stranger; and any conduct which as against an individual would establish acceptance, will also as against the corporation.  The old idea that a corporation would be bound only by a contract under seal, has long since been done away with.  The vast amount of business now being transacted by such organizations, has compelled the application of more liberal rules.  And now, no corporation any more than an individual can experiment with a contract, take possession of the property contracted for, test its value, and then repudiate on the ground that no separate agent acting in the premises had full power to bind the corporation by the purchase.

In Green's Brice's Ultra Vires, 463, will be found the following language:

"It must also be remembered that the tendency of modern judicial interpretation and legislation has been to waive needless formalities, and that consequently at the present many agreements are held binding on corporate bodies, even without ratification, which a few years since would, from technical reasons, not have been so."

And on page 379, is this:

"Within certain limits, it would also seem that corporations by acting upon, without expressly 'ratifying' a contract—not necessarily relating to a subject essential to their existence—which does not bind them for want of sealing,

may so far adopt it as to render themselves liable to an action either for use and enjoyment or upon the common counts, the nature and extent of their liability being estimated by a reference to the terms of the invalid agreement. It may, perhaps, be considered that the corporation has thereby actually ratified the agreement in question, but it would probably be the simpler and more reasonable explanation to say that the corporation by so acting is estopped from subsequently repudiating and denying the transaction."

Now it appears in this case that Peter was largely interested as a stockholder in the defendant corporation; that he had been instrumental in securing other lands for the defendant; that Blandin was president and a director, (the board of directors consisting of five members, two of whom were non-residents of the state, and seldom present); that Peter and Blandin consulted together, and decided that it was advisable for the corporation to purchase this land, and in pursuance thereof Peter sought the plaintiff and persuaded him to enter into the contract; that the negotiations therefor were had in the office of the defendant; that the contract was made in the name of the defendant, and was executed by one assuming to have authority to bind the defendant; that the sum of $500, the cash payment, was at the time made by Peter, by giving his individual check, and that this sum thus advanced was returned to him by the check of the treasurer, also a director, under instructions from the president, and the amount allowed by the board in their settlement with the treasurer; that the defendant took possession of the land, and sent employés thereon to prospect for coal, sinking several prospect-holes therefor; that the vein not proving as thick as was expected, about a month thereafter Peter sent to plaintiff an open letter, by the hands of the president, in which he, admitting the purchase, states that it was made on account of representations as to the coal which had proved untrue, and that therefore the land was not wanted, and urges an arrangement of the matter in a christian spirit; that after the sending of this letter, the company continued for a short time its work on the farm, and that there never

has been any express disaffirmance by the directors of this purchase. It also appears that at the next annual meeting after this controversy, the by-laws of the corporation were amended by adding this provision: "And all purchases and leases of real estate by the officers of this company shall be approved by the board of directors before the same shall be binding upon this company;" and thereupon the board proceeded to formally approve several contracts made by Peter and assigned to the company, and some by whom made does not appear.

In the light of these facts, can it be doubted that the corporation accepted this contract? We think not. Take the matter of payment: A contract is made in which it is named

4. Agency; ratification; contract construed.

as a party purchasing a certain tract of land; it is made by its principal stockholder upon consultation with its chief executive officer. Upon the face of the paper it is entitled to the deed, and is obligated for the price. In the absence of the officers, the stockholder advances the first payment of $500. The president directs the treasurer to refund this money, and the treasurer does so. Both the president and treasurer are directors, and the two are a majority of the resident directors. The treasurer reports his action to the board, and his action is approved. What is approved?—a donation of $500 of corporate money, or a first payment on the contract? Can directors give away corporate funds? Would not that be a clear violation of official duty? Otherwise than as a first payment on and acceptance of the contract, this appropriation of $500 to Peter was as clear a wrong upon the corporation as an embezzlement of like amount by the treasurer or other officer. No such imputation of wrong should be made. Again, the appropriation did not purport to be a donation. The president did not direct the treasurer to make a donation to Peter, neither did the treasurer intend a donation. Each knew that Peter had advanced money for the corporation, and each intended a reimbursement of that money. In so reimbursing they ratified the act and the whole act, and when the board approved, they

approved it as a whole. This act of the board was either a gross perversion and misappropriation of corporate funds, or a recognition of the act of Peter as an act of the corporation. It will not do to say that the corporation may accept in part and reject in part. Like any other principal, it accepts or rejects *in toto*. Neither was there anything to indicate an attempt to accept a part and reject the rest. The appropriation was not accompanied by any disaffirmance of the act. It may be conceded that a corporation, like an individual, may compensate a third party for losses in doing an unauthorized act, without assuming responsibility for the act. It was within the power of the corporation to pay Peter $500 without ratifying the contract or assuming the liability which he had attempted to incur for it. But it must do something to evince such an intention — it must show that it repudiates his act while it compensates him for his loss. If it simply return to him the money he has assumed to advance for it, it implies an assumption of the act. Here the return was made without any limitation or qualification, and evidently the first thought was to avoid the contract, not on the ground that it was not the contract of the corporation, but on the ground of the misrepresentations of the vendor.

Again, take the matter of possession. Delivery of possession has been said to be sufficient part performance to take a parol contract for the sale of lands out of the statute of frauds. (*Edwards v. Fry*, 9 Kas. 423.) And this is upon the ground that the entry into possession is, unless supported by the contract, a trespass subjecting the party entering to an action for damages. In like manner the entry into possession and sinking of prospect-holes is consistent only with an acceptance of the contract. In any other light, it was a flagrant trespass. It implied an intent to commit a gross invasion upon the rights of Durham; an invasion which unless withstood, might ripen into a title by the mere lapse of time. It either entered under the contract or committed a trespass. The inference from the act is, that it intended the former rather than the latter. Just as when a lease is prepared and

signed by the lessor, if the lessee with full knowledge thereupon enters and takes possession of the premises, the law implies an acceptance of the lease, and that he is bound by its terms; and the burden is on him to show the contrary, and that he entered in defiance of the lease and in disregard of the lessor's rights. Taking possession is *prima facie* an acceptance of any right to enter which is shown to exist, and when a party *may* rightfully enter and does enter, the implication will be that the entry was rightful and not wrongful. In the case of *London, &c., Rly. Co. v. Winter*, 1 Cr. & Ph. 57, the entering into possession of land and constructing a railroad over it was adjudged an acceptance of a contract for its purchase, and avoided the necessity of any inquiry into the power of the agent to make it. In *Shaver v. B. R. & M. Co.*, 10 Cal. 396, the manager of a mining company purchased in the name of the corporation a house to be used as an office for the corporation and a boarding-house for its laborers. He took possession, and subsequently several meetings of the trustees were held in the house. At one of these meetings a resolution was offered and rejected, declaring the contract legal and binding. No other vote or action of the trustees was shown. In a suit for the balance of the purchase-money, it was held that if the authority of the manager to make the purchase were doubtful, the acts stated amounted to a ratification. The court remarked that "the entry of the resolution was a very singular mode of repudiating a contract. It would have been more in accordance with correct notions of propriety and justice if a resolution refusing to accept a contract had been passed, accompanied by an offer to cancel the deed, which had not been recorded, and return the property of which they were in possession." See also, *Moss v. Averell*, 10 N. Y. 449; *Church v. Sterling*, 16 Conn. 388; *Chicago B. Soc. v. Crowell*, 65 Ill. 453; *Wilson v. W. H. H., &c., Co.*, 2 DeG. J. & S. 475; 34 L. J. Ch. 241; *Crook v. Corporation of Seaford*, L. R. 6 Ch. 551.

Again, take the failure to disaffirm the contract. It was made in the name of the corporation, and knowledge of its

terms was possessed by a majority of the resident directors, yet there is no disaffirmance of the act of Peter. Indeed, the only thing attempted was rescission, and not disaffirmance; and rescission implies an existing contract to be rescinded. It is the duty of a principal, when aware that one is assuming as agent to contract in his behalf, to deny the power and disown the act, and a failure to do this will often work an affirmance of the power and a ratification of the act. In *Kelsey v. National Bank*, 69 Pa. St. 426, upon a robbery of the bank, the cashier, with the concurrence of a minority of the directors, offered a reward. The majority of the directors resided in the city, became aware of what had been done, and took no steps to disavow the act, and it was held that the bank was liable. (*Reuter v. Electric Tel. Co.*, 6 El. & Bl. 341, Q. B.; 26 L. J. Q. B. 46; *Bredin v. Dubarry*, 14 S. & R. 30; *Gordon v. Preston*, 1 Watts, 387; *Browning v. G. C. M. Co.*, 5 H. & N. 856; 29 L. J. Ex. 399.)

We might extend this opinion, noticing other matters in the conduct of the corporation, but they would be simply in the same line of thought. We are clearly of the opinion that the testimony shows an acceptance of the contract, and that therefore the district court erred in its findings for the defendant. See further, upon the questions in this case, *Howe v. Keeler*, 27 Conn. 538; *Krider v. Western College*, 31 Iowa, 547; *Ins. Co. v. De Wolf*, 8 Pick. 56; *E. Rld. Co. v. Benedict*, 5 Gray, 561; *Olcott v. Tioga Rld. Co.*, 27 N. Y. 546; *Phosphate of Lime Co. v. Green*, L. R. 7 C. P. 43; *Moss v. Rossie Lead Co.*, 5 Hill, 137; Green's Brice's Ultra Vires, chapters 3 and 6.

The judgment of the district court will be reversed, and the case remanded with instructions to grant a new trial.

All the Justices concurring.